Filed 12/22/20  Kaileh v. San Francisco Residential Rent etc. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| IBRAHIM KAILEH et al., <br><br>        Plaintiffs and Appellants, <br><br> v. <br><br> SAN FRANCISCO RESIDENTIAL RENT STABILIZATION AND ARBITRATION BOARD et al., <br><br>        Defendants and Respondents. | A156704 <br><br> (City & County of San Francisco Super. Ct. No. CPF-17-515847) |

The Costa-Hawkins Rental Housing Act (Civ. Code, § 1954.50 et seq.) (the Costa-Hawkins Act) permits property owners to increase rent above local rent control ceilings for a residential unit occupied by "a lawful sublessee or assignee who did not reside at the dwelling or unit prior to January 1, 1996," where "the original occupant or occupants who took possession of the dwelling or unit pursuant to the rental agreement with the owner no longer permanently reside there."  (§ 1954.53, subd. (d)(2) (hereafter, § 1954.53(d)(2)).)  Put another way, where the original occupants have permanently vacated the premises, the Costa-Hawkins Act preserves local rental rate protections for "a lawful sublessee or assignee who [resided] at the dwelling or unit prior to January 1, 1996."  (*Ibid.*)

1

In this case, appellants Ibrahim and Maha Kaileh own a San Francisco apartment building in which the original occupant of a unit no longer permanently resides there, but his adult son—who became a sublessee after January 1, 1996—now lives in the unit. As a minor child born after the start of his father's tenancy, the son split his time living in the unit with his father and living elsewhere with his mother from the time of his birth to January 1, 1996, pursuant to a co-parenting arrangement. The question presented is whether the Costa-Hawkins Act permits appellants to raise the rent for the unit above the local rent control ceiling because the son is a "sublessee . . . who did not reside at the . . . unit prior to January 1, 1996" within the meaning of section 1954.53(d)(2).

In *T & A Drolapas & Sons, LP v. San Francisco Residential Rent Stabilization and Arbitration Bd.* (2015) 238 Cal.App.4th 646 (*Drolapas*), the Court of Appeal construed section 1954.53(d)(2) as conferring rental rate protection to any person who resided in a unit before January 1, 1996 and who became a lawful sublessee either before or after that date. Applying *Drolapas*'s interpretation, we conclude the undisputed facts establish the son's status as a sublessee who qualifies for protection under section 1954.53(d)(2). Accordingly, we affirm the trial court's denial of appellants' petition for writ of administrative mandamus.

### FACTUAL AND PROCEDURAL BACKGROUND

In November 2016, appellants petitioned the Residential Rent Stabilization and Arbitration Board (the Rent Board) for a determination that they are entitled as owners of a specified unit to impose an "unlimited

2

rent increase"[1] pursuant to the Costa-Hawkins Act and sections 1.21 and 6.14 of the Rent Board Rules because the lessee no longer permanently resides in the unit, and because the lessee's son took possession of the unit as a sublessee in early 2012.

In January 2017, an administrative law judge (ALJ) presided over a hearing on the matter. Several witnesses testified, including Ibrahim Kaileh and his son Luai Kaileh, Roger MacDonald and his son Morgan MacDonald, Melanie Austin (Morgan's mother),[2] and certain other tenants in the apartment building. The record of that hearing includes evidence of the following facts.

Roger and Robin Fragner began leasing the subject unit in 1974 from the previous landlord. The lease was not introduced into evidence. In 1979, Fragner moved out of the unit.

In 1986, Roger's son Morgan was born. At the time, Morgan's mother Melanie lived a few blocks away. Even though Roger and Melanie never lived together and did not have a formal written custody agreement, they co-parented and shared joint custody of Morgan since his birth.

Pursuant to the co-parenting arrangement, Morgan grew up living with each parent. Morgan regularly lived with Melanie while school was in session, and because of Melanie's work they lived in various locations over the years, including San Francisco, Belize, Lagunitas, Cotati, and Baltimore.

---

[1]    As used in this opinion, an "unlimited rent increase" refers to a rent increase that is not subject to the rent increase limitations established by the Rent Board Rules and Regulations (Rent Board Rules).

[2]    For brevity sake, because Roger MacDonald and Morgan MacDonald share the same last name, and the same with Ibrahim Kaileh and Luai Kaileh, we will refer to them by their respective first names. For consistency of style, we will also refer to Melanie Austin by her first name. No disrespect is intended.

3

During summers and on weekends, vacations, holidays, and some weekdays, Morgan lived with Roger in the unit (except for the 18-month period when Melanie worked in Belize). Both parents made extreme efforts to share custody of Morgan during Melanie's moves.

Roger has always kept a bedroom in the unit for Morgan, containing Morgan's bed, clothes, posters, and toys. Photographs documented Morgan's life with Roger at the unit. These included pictures of a growth chart tracking Morgan's height from 1993 through 2009, Morgan celebrating birthdays and holidays at the unit, Morgan working on homework and school projects, and friends visiting Morgan at the unit. Pictures of Morgan have been in the unit's hallway since 1986, and his toys, drawings, and projects are displayed throughout the unit. Beginning in the early 1990's and continuing up to the time of the hearing, Roger and Morgan engaged in summer activities together, including attending and later becoming counselors together at a family summer camp.

After Melanie returned to Cotati from Baltimore, Morgan attended high school in Rohnert Park and Santa Rosa Junior College. During this time, Morgan continued to visit and stay with Roger at the unit. Morgan finished junior college in 2009 and began attending San Francisco State later that year, where he obtained his teaching credential. Morgan lived at the unit while attending San Francisco State.

Off and on beginning when Morgan turned 18 years old in 2004, Morgan paid Roger a portion of the unit's rent when he was able to do so. Roger did not require regular rent payments because he wanted to help his son.

Roger began moving out of the unit in 2011 and spent less and less time at the unit. The utilities for the unit remain in Roger's name. Since

4

2012 or 2013, Sara Yeiter has lived with Morgan at the unit. They pool the rent and pay Roger. Morgan is now a special education teacher in San Francisco.

Appellants bought the building in 2003. Ibrahim did a 10-minute walk-through of the unit at that time and has been in the unit one or two times. He saw only one bed in the unit and did not see Morgan or his possessions inside the unit.

Ibrahim testified he received estoppel certificates when he purchased the property. The estoppel certificates did not list the names of occupants, and the certificate for the unit was not submitted at the hearing. In 2012, Roger told Ibrahim that Morgan was moving into the unit. Ibrahim contended that on or about June 1, 2012 he sent a notice addressed to "Roger MacDonald, and all others occupying the [unit]," pursuant to section 6.14 of the Rent Board Rules. Although Ibrahim had sent the notice by certified mail, he did not offer a certified mailing receipt at the administrative hearing. Roger does not recall receiving a section 6.14 notice, and the spaces for a recipient's initials provided on each page of the notice were left blank.

In November 2016, Ibrahim served a "60 Day Notice to Change Terms of Tenancy (Rent Increase)" addressed to Roger and to Morgan as a subtenant under section 6.14 of the Rent Board Rules, increasing the monthly rent from $581.84 to $4,500.00, effective February 1, 2017. The notice stated that Roger, the original tenant, no longer resided in the unit. Later that month, appellants filed their petition for a rent increase with the Rent Board.

In addition to receiving the foregoing testimony and evidence, the ALJ accepted the parties' stipulation that Roger no longer permanently resided in the unit, that Morgan was a lawful sublessee of Roger rather than a co-

5

tenant, and that the increased rent commencing February 1, 2017 did not have to be paid during the pendency of the case.

In April 2017, the ALJ issued a decision determining the Costa-Hawkins Act precluded an unlimited rent increase since Morgan is "a lawful subtenant who resided in the unit prior to January 1, 1996." The ALJ also found that an unlimited rent increase was not authorized under section 6.14 of the Rent Board Rules because appellants failed to prove they properly served notice on Morgan as the rule required. Having so concluded, the ALJ denied appellants' petition and held the February 1, 2017 monthly rent increase from $581.84 to $4,500.00 was null and void.

After the Rent Board denied their appeal of the ALJ's decision, appellants filed a petition for writ of administrative mandamus and complaint for declaratory relief, naming the Rent Board and the City and County of San Francisco as respondents. The trial court denied the petition and entered judgment in favor of respondents.

## DISCUSSION

"The Costa-Hawkins Act was enacted in 1995 to ameliorate the impact of local rent control efforts, and specifically vacancy control, through which rent controls in a few locales remained in place even when an apartment was voluntarily vacated and a new tenancy began. The legislation was billed by proponents as a 'moderate approach to overturn extreme vacancy control ordinances which unduly and unfairly interfere into the free market.' [Citation.] The Act preempts local rent control ordinances in some circumstances. 'Its overall effect is to preempt local rent control ordinances in two respects. First it permits owners of certain types of property to adjust the rent on such property at will, "[n]otwithstanding any other provision of law." (Civ. Code, § 1954.52, subd. (a).) Second it adopts a statewide system

6

of what is known among landlord-tenant specialists as "vacancy decontrol," declaring that "notwithstanding any other provision of law," all residential landlords may, except in specified situations, "establish the initial rental rate for a dwelling or unit." (Civ. Code, § 1954.53, subd. (a).)' [Citations.] 'San Francisco's ordinance is consistent with the Costa-Hawkins Act in allowing a landlord to set the initial rental rate on vacated units. (S.F. Admin. Code, § 37.3, subd. (d)(1).)' " (*Drolapas*, *supra*, 238 Cal.App.4th at pp. 651–652.)

In administrative mandamus cases, we ordinarily review the decision of the administrative agency for prejudicial abuse of discretion. (*Drolapas*, *supra*, 238 Cal.App.4th at p. 651.) Here, the ALJ and the Rent Board determined that appellants cannot impose an unlimited rent increase under the Costa-Hawkins Act given Morgan's status as a lawful sublessee who resided in the unit prior to January 1, 1996. Appellants do not dispute the ALJ's findings of fact regarding Morgan's life at the unit, and the parties agree the principal issue in this case turns on a pure question of law, i.e., the proper interpretation of section 1954.53(d)(2) of the act. Appellants make additional contentions pertaining to section 6.14 of the Rent Board Rules.

**A. Section 1954.53(d)(2)**

Section 1954.53(d)(2) of the Costa-Hawkins Act provides: "If the original occupant or occupants who took possession of the dwelling or unit pursuant to the rental agreement with the owner no longer permanently reside there, *an owner may increase the rent by any amount allowed by this section to a lawful sublessee or assignee who did not reside at the dwelling or unit prior to January 1, 1996*."[3] (Italics added.)

---

[3] While section 1954.53(d)(2) refers to both sublessees and assignees, for brevity sake our analysis of the statute will at times refer simply to sublessees.

The parties concur that certain aspects of section 1954.53(d)(2) are met in this case. Specifically, they agree that Roger had occupied the unit pursuant to a rental agreement predating January 1, 1996, that he no longer permanently resided there as of November 2016, and that Morgan did not sublet the unit prior to January 1, 1996 but that he has been a lawful sublessee during the pendency of this case.

The central point of disagreement is whether Morgan is "a lawful sublessee . . . who did not reside at the dwelling or unit prior to January 1, 1996." (§ 1954.53(d)(2).) According to appellants, in situations where all original lessee occupants have permanently vacated a unit, the above-quoted statutory language prohibits an unlimited rent increase to any person who resided in a unit as a lawful sublessee prior to January 1, 1996. Respondents, however, contend the language also bars an unlimited rent increase to a person who resided in a unit prior to January 1, 1996 but did not become a lawful sublessee until after that date. Notably, our Division Four colleagues addressed this issue of statutory interpretation in *Drolapas*, *supra*, 238 Cal.App.4th 646.

In *Drolapas*, a couple and their minor children moved into a San Francisco apartment unit in 1995. (*Drolapas*, *supra,* 238 Cal.App.4th at p. 649.) In 2000, the appellant purchased the apartment building, and the parents signed an estoppel certificate in which they stated that they were the tenants but that "the unit was 'occupied' by two adults and four children, and this was the 'number of allowable tenants.' " (*Ibid*.) In December 2010, the parents vacated the unit but continued to pay the rent. (*Ibid*.) Meanwhile, one of their children, Borjas, continued to live in the unit as an adult and paid rent to his parents when he was able to do so. (*Ibid*.) *Drolapas* affirmed

the determination of the Rent Board and the trial court that the appellant could not raise the rent after Borjas's parents moved out.

*Drolapas* based its decision on two separate grounds. First, the court reasoned that Borjas—having resided as a minor in the subject unit from the start of the tenancy with the landlord's consent—qualified as an " 'original occupant . . . who took possession of the dwelling or unit pursuant to the rental agreement' " under section 1954.53(d)(2). (*Drolapas*, *supra*, 238 Cal.App.4th at pp. 652–653.) Following the court's reasoning in *Mosser Companies v. San Francisco Rent Stabilization and Arbitration Bd.* (2015) 233 Cal.App.4th 505 (*Mosser Companies*),[4] *Drolapas* rejected the landlord's theory that Borjas could not be an "original occupant" because he was not an original signatory to the rental agreement signed by his parents. (*Drolapas*, at p. 653.) This holding in *Drolapas* is not implicated in this appeal.

As a second basis for its decision, *Drolapas* addressed the same question here, i.e., whether Borjas qualified under section 1954.53(d)(2) as a "lawful sublessee or assignee who did not reside at the dwelling or unit prior to January 1, 1996." (*Drolapas*, *supra*, 238 Cal.App.4th at pp. 653–654.) *Drolapas* declined to interpret section 1954.53(d)(2) as prohibiting rent increases "only for those who were subtenants prior to January 1, 1996," because it found no such temporal restriction in the statute. (*Drolapas*, at

---

[4]  In *Mosser Companies*, a couple and their three minor children moved into a San Francisco apartment unit, with the landlord's consent, in 2003. By 2012, the parents and two of the then-adult siblings had moved out of the unit. (*Mosser Companies*, *supra*, 233 Cal.App.4th at p. 509.) *Mosser Companies* held the landlord could not impose an unlimited rent increase on the third adult sibling remaining in the unit because he was protected under the Costa-Hawkins Act as an original occupant who took possession of the unit pursuant to the original rental agreement and he continued to permanently reside there. (*Mosser Companies*, at pp. 515–516.)

9

p. 654.) In articulating its reasoning, *Drolapas* explained the statutory clause "has two requirements: (1) the individual must be a 'lawful sublessee or assignee,' and (2) he or she must have 'reside[d] at the dwelling or unit prior to January 1, 1996.' (§ 1954.53, subd. (d)(2).) There is no requirement under the statute that those two qualifications must have been met simultaneously." (*Drolapas*, at p. 654.) Thus, because "Borjas was a subtenant beginning in 2011, and he did reside in the unit prior to January 1, 1996," *Drolapas* concluded he met both statutory requirements and was entitled to local rental rate protection. (*Ibid*.) Reduced to its essence, *Drolapas*'s interpretation of section 1954.53(d)(2) requires only that one's residency, not one's subtenancy, be before January 1, 1996.

In light of *Drolapas*'s holding that Borjas qualified for rental rate protection as an original occupant, appellants contend its discussion of the sublessee issue should be disregarded as dictum. We disagree. Where two independent grounds are given for a decision, neither one is dictum and each is of equal validity. (*People v. Mendoza* (2020) 44 Cal.App.5th 1044, 1056, fn. 5.)

To be sure, we are not bound by *Drolapas*'s interpretation. That said, we respect the principle of stare decisis and will follow it absent good reason to disagree. (See *Look v. Penovatz* (2019) 34 Cal.App.5th 61, 72.) We thus consider appellants' arguments for their alternative interpretation, i.e., that the statutory sublessee clause bars rent increases only for those residents who became sublessees prior to January 1, 1996.

Appellants argue *Drolapas*'s interpretation of section 1954.53(d)(2) is contrary to its grammar and punctuation. Not exactly. While appellants correctly observe that the clause "who did not reside at the dwelling or unit prior to January 1, 1996" is a modifying clause that limits or restricts the

10

antecedent noun "a lawful sublessee," the statutory phrase remains susceptible of both interpretations. Indeed, had the Legislature intended to insulate only pre-1996 sublessees from unlimited rent increases, it could have more clearly specified, for example, that an owner may increase the rent to "*an occupant who did not reside at the dwelling or unit as a lawful sublessee or assignee prior to January 1, 1996*," or alternatively, to "*an occupant of a dwelling or unit who was not a lawful sublessee or assignee prior to January 1, 1996.*"

Appellants next assert that *Drolapas*'s interpretation is contradicted by the legislative history. As originally enacted in 1995, the Costa-Hawkins Act allowed owners to set initial rental rates upon vacancy by all original lessee occupants only where the subject rental agreements prohibited or required owner consent for subletting. (Former § 1954.53, added by Stats. 1995, ch. 331, § 1, p. 5, eff. Jan. 1, 1996 (Assem. Bill No. 1164).) The act's requirement of a " 'no subletting' " clause caused "considerable controversy" because owners began amending their leases to include the necessary prohibitory language and also started sending "tenants notices that they could no longer bring in roommates or had to get rid of existing roommates who were not on the written rental agreement." (Sen. Com. on Judiciary Analysis of Assem. Bill No. 3244 (1995–1996 Reg. Sess.) as amended June 24, 1996, p. 3 (Sen. Judiciary Analysis).) Because the resulting proliferation and enforcement of leases prohibiting subletting "could dramatically affect disabled and elderly tenants who often rely on a live-in attendant for their daily need" (*ibid.*), Assembly Bill No. 3244 proposed to relieve owners from the requirement of a contractual subletting prohibition and to instead adopt the language now contained in subdivisions (d)(2) and (d)(3) of section 1954.53 to clarify and better protect "the rights of existing tenants to change

11

roommates without being subject to a rent increase (as long as one of the original tenants to the rental agreement continues to reside in the rental unit.).”[5] (Sen. Judiciary Analysis, at pp. 3–4.)

One legislative analysis of Assembly Bill No. 3244 contained a statement that the bill as amended would “clarify that an existing tenant or *pre-January 1, 1996 sublessee* is not subject to a rent increase by reason of a ‘partial change in occupancy.’ ” (Sen. Judiciary Analysis, *supra*, at p. 4, italics added.) Appellants seize on the italicized language as demonstrating the Legislature’s intent that section 1954.53(d)(2) refers only to a “pre-January 1, 1996 sublessee” or, in appellants’ words, “individuals who were ‘lawful sublessees’ prior to 1996.”

We are not convinced. Considered in context, the legislative bill analysis used the term “pre-January 1, 1996 sublessee” in describing the importance of the bill’s change-in-occupancy amendments to a certain organization tracking the bill. That particular term is used nowhere else in the legislative history, and its one-time mention does nothing to elucidate the Legislature’s intent in adopting the seemingly broader phrasing of “a lawful sublessee . . . who did not reside at the dwelling or unit prior to January 1, 1996.” (Former § 1954.53, subd. (d), par. Two; § 1954.53(d)(2); see *Ailanto*

---

[5]     Assembly Bill No. 3244 inserted such language into the existing subdivision (d) of section 1954.53. A later amendment of section 1954.53 placed the exact same language into new subparts (2) and (3) of subdivision (d). (§ 1954.53, as amended by Stats. 1999, ch. 590, § 2 (Sen. Bill No. 1098).)

Section 1954.53, subdivision (d)(3), provides: “This subdivision does not apply to partial changes in occupancy of a dwelling or unit where one or more of the occupants of the premises, pursuant to the agreement with the owner provided for above, remains an occupant in lawful possession of the dwelling or unit, or where a lawful sublessee or assignee who resided at the dwelling or unit prior to January 1, 1996, remains in possession of the dwelling or unit. Nothing contained in this section shall be construed to enlarge or diminish an owner’s right to withhold consent to a sublease or assignment.”

*Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 587–588 [brief mention in two legislative caucus analyses found insufficient as indicia of legislative intent].)

Appellants' invocation of other extrinsic aids—such as legislative purpose and policy—likewise fails to advance their interpretation. Viewing Assembly Bill No. 3244 as representing a legislative effort to improve the rental market for property owners, appellants argue the statutory clause must be construed as a narrow carve-out for pre-1996 sublessees. As indicated, however, the bill's amendments also aimed to address the concerns of renters and affordable housing advocates over the consequences of occupancy changes. Thus, we discern no basis for interpreting the particular clause in favor of one group over the other. Moreover, appellants make no showing that *Drolapas*'s five-year-old interpretation of section 1954.53(d)(2) has frustrated the overall policy objectives of the Costa-Hawkins Act.

Finally, with every year that passes, the requirement that a sublessee must have resided in a unit before January 1, 1996 increases in significance as a meaningful restriction on the pool of sublessees who qualify for local rental rate protection. At this juncture, it appears questionable whether continued adherence to *Drolapas*'s construction of section 1954.53(d)(2) substantially increases the number of sublessees eligible for rental rate protection beyond those who qualify under appellants' narrower interpretation.[6]

---

[6] Appellants may be understood to suggest that adherence to *Drolapas*'s interpretation of section 1954.53(d)(2) would mean a person who lived in a unit only occasionally, or a person whose residence terminated one or more years before 1996, would be eligible for rent protection upon entering a sublease decades later. For example, they raise the hypothetical possibility that people who lived at the subject unit for any amount of time before 1996 (such as Morgan's half-sister) might qualify as future sublessees under the

In sum, appellants have not presented any good reason for rejecting *Drolapas*, which has stood for five years without drawing criticism from other appellate decisions or relevant secondary sources. Accordingly, we adhere to *Drolapas*'s holding that section 1954.53(d)(2) is properly interpreted as including rent control protection for those who resided in a unit prior to January 1, 1996 and entered a sublease after that date.

**B. Morgan's Residence in the Unit Prior to January 1, 1996**

Appellants further contend that, assuming we adhere to *Drolapas*'s construction of section 1954.53(d)(2)'s sublessee clause, Morgan did not *reside* in the unit within the meaning of that clause because he did not commence his occupancy at the inception of Roger's tenancy (because he was not born yet), and he did not reside "principally" and "continuously" in the unit from the time of his birth to 1996 (because he primarily lived elsewhere with his mother). In this regard, appellants urge this court to interpret the statutory term "reside" in a manner consistent with *Drolapas*, which they view as holding that sublessees must have resided principally and continuously in a unit prior to January 1, 1996.

The Costa-Hawkins Act provides no definition of the term "reside" and does not specify that a sublessee must have moved into a unit when the original lease occupant took possession and must also have resided there "principally" and "continuously" before January 1, 1996. True, *Drolapas* affirmed a judgment in favor of a sublessee who as a minor commenced occupancy at the inception of his parents' lease in 1995 and who apparently lived nowhere else but in the unit until January 1, 1996 and beyond. But *Drolapas* did not involve a dispute over the particular minor's residency in

statute. We need not and do not address such speculative scenarios, save for noting section 1954.53(d)(2)'s additional requirement that eligible sublessees must have *resided* in a unit before January 1, 1996.

the unit and had no reason to address section 1954.53(d)(2)'s application in the type of circumstances presented here.

In determining that "Morgan resided at the subject unit prior to January 1, 1996," the ALJ found there was "substantial evidence that prior to January 1, 1996, Morgan, who was nine years old at that time, had been living in the unit in his own bedroom during summers, some holidays, some weekdays and weekends for many years pursuant to a joint custody agreement between Roger and Morgan's mother Melanie Austin." Whether reviewing that decision for a prejudicial abuse of discretion or conducting a de novo review (*Drolapas*, *supra*, 238 Cal.App.4th at p. 651), we conclude the evidence amply establishes that Morgan—as a minor who spent substantially equal amounts of time growing up with each parent in their separate residences under a joint custody arrangement—resided with Roger in the unit prior to January 1, 1996.

Our conclusion is consistent with the general legislative presumption that when parents are able to agree to it, "joint custody is in the best interest of a minor child." (Fam. Code, § 3080.) Joint custody in appropriate cases promotes the desirable purpose of keeping both parents actively and continuously involved in the raising of a minor child, particularly where, as here, the child is young and resides with each parent for substantially equal amounts of time pursuant to a relatively fixed and permanent schedule. Under such circumstances, and combined with evidence that the child kept clothes, toys, and a dedicated room and bed in a unit, a finder of fact could reasonably conclude that the child resided there for purposes of the Costa-Hawkins Act. At the other end of the spectrum, one might reasonably conclude that a minor child did not reside in a unit where the child did not maintain a room, a bed, or personal belongings in the unit and merely stayed

15

there sporadically or on occasion. Consideration of all such circumstances is appropriate and aligns with the common dictionary meaning of the term "residence" as "the act or fact of dwelling in a place for some time" or "the place where one actually lives as distinguished from one's domicile or a place of temporary sojourn." (Merriam-Webster.com Dictionary, "residence" http://www.merriam-webster.com/dictionary/residence [as of Dec. 2, 2020].) On the other hand, were section 1954.53(d)(2) construed as appellants urge, a child who spent substantially equal time living with each parent in different rent-controlled dwellings prior to 1996 would not qualify as having principally and continuously resided at either dwelling. As respondents point out, the Costa-Hawkins Act should not be interpreted in a manner that penalizes the children of physically separated parents who agreed to and abided by a substantially equal physical custody arrangement, as the Legislature has encouraged.

Here, the record establishes that Roger and Melanie made extreme efforts to share joint custody of Morgan from the time of his birth to January 1, 1996 and beyond, and that Morgan split his time growing up in each parent's household. Although Morgan lived with Melanie at her varied places of residence when school was in session, he regularly lived in Roger's unit in his own bedroom during summers, weekends, vacations, holidays, and some weekdays (save for an 18-month period when Melanie was working in Belize). Indeed, out of all the abodes where Morgan lived as a child, Roger's unit was the one most constant in his childhood, the residence to which he would always return pursuant to a regular fixed schedule. Thus, even assuming the Costa-Hawkins Act is reasonably understood as requiring that a sublessee must have resided "principally" and "continuously" in a unit prior to January 1, 1996, that requirement has been met here. Based on the

16

totality of the circumstances in the record, we deem it reasonable to conclude that for the nine years starting from his date of birth, Morgan resided in the unit prior to January 1, 1996 for purposes of section 1954.53(d)(2).

Appellants' authorities do not persuade us otherwise. In *Bisno v. Santa Monica Rent Control Bd.* (2005) 130 Cal.App.4th 816, a tenant appealed from a judgment that turned on the validity of a Santa Monica rent control regulation that permits landlords to petition for a rent increase when a tenant of a rental unit is not occupying it as a principal residence. (*Bisno*, at p. 818.) Emphasizing that Santa Monica's law essentially focuses on *residents* (*id.* at pp. 822–823), *Bisno* determined the law and its regulations are intended to benefit "those who *reside principally in their rent-controlled units* or who have a genuine and reasonable justification for not doing so on a temporary basis" (*id.* at p. 823, italics added). *Bisno* ultimately affirmed the judgment. (*Id.* at p. 818.) We have no quarrel with the *Bisno* decision, but note it involved the application of a local rent control regulation to an adult lessee and did not address the Costa-Hawkins Act or any considerations pertaining to a minor's residence.

Appellants also rely on *San Francisco Apartment Assn. v. City and County of San Francisco* (2018) 20 Cal.App.5th 510, which addressed a facial challenge to a San Francisco ordinance that precluded no-fault evictions during the school year of households that include a student or an educator, as defined in the ordinance. (*Id.* at p. 513.) The decision ruled the ordinance was not preempted by state unlawful detainer statutes because it properly regulated the substantive grounds for eviction and did not interfere with state eviction procedures. (*Id.* at pp. 515–519.) Notably, the decision did not examine the meaning of "reside" as used in that ordinance or in the Costa-Hawkins Act.

17

In sum, appellants demonstrate no basis for overturning the Rent Board's decision denying a rent increase pursuant to the Costa-Hawkins Act.[7]

## DISPOSITION

The judgment is affirmed.

---

[7] In light of our conclusion that Morgan was a protected sublessee under the Costa-Hawkins Act, appellants' legal and factual contentions regarding section 6.14 of the Rent Board Rules are moot.

_____

Fujisaki, J.

WE CONCUR:

_____

Siggins, P.J.

_____

Petrou, J.

A156704